MIDLANTIC NATIONAL BANK/MERCHANTS, AS SUCCESSOR IN INTEREST TO FIRST MERCHANTS NATIONAL BANK, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Midlantic Nat'l Bank/Merchants v. Commissioner
Docket No. 13535-79.
United States Tax Court
T.C. Memo 1983-581; 1983 Tax Ct. Memo LEXIS 207; 46 T.C.M. (CCH) 1464; T.C.M. (RIA) 83581; September 21, 1983. Peter C. Aslanides and Michael A. Guariglia, for the petitioner. Andrew I. Panken and Leslie J. Spiegel, for the respondent. HAMBLEN
MEMORANDUM FINDINGS OF FACT AND OPINION HAMBLEN, Judge: Respondent determined the following deficiencies in petitioner's Federal income taxes: Year
Deficiencies
1966 [1]
$10,650.84
1970
11,783.00
1973
27,195.00
1974
26,247.00
*208 The issue for decision is whether petitioner is entitled to amortize the amount allocated to the cost of the right to solicit new bank accounts from the former depositors of a bank that had failed and was being liquidated. FINDINGS OF FACT Some of the facts have been stipulated are are found accordingly. At the time it filed its petition herein, Midlantic National Bank/Merchants (hereinafter MNM) had its principal office located in Neptune, New Jersey. In January 1979, MNM, then known as Midlantic National Bank/Raritan Valley, acquired and merged with First Merchants National Bank (hereinafter petitioner), located in Neptune, New Jersey, and changed its name to Midlantic National Bank/Merchants. Pursuant to this merger, MNM became petitioner's successor and assumed its obligations and liabilities for unpaid taxes. Petitioner timely filed Federal corporate tax returns for 1966, 1970, 1973, 1974, and 1976 with the Internal Revenue Service. Petitioner also filed an amended corporate income tax return (Form 1120X) for 1970. During 1970, petitioner was a national banking association with 20 branch offices throughout Monmouth County, New Jersey. On August 8, 1970, after *209 unsuccessfully attempting to arrange a sale of the Eatontown National Bank (hereinafter ENB), a national banking association with its principal office located in Eatontown, New Jersey, to other local banking interests, the Comptroller of the Currency of the U.S. Treasury Department declared ENB insolvent and ordered it closed. In June 1970, a semiannual report issued by ENB indicated that it held $16,540,650 in assets. At the time that the Comptroller of the Currency closed ENB, it owed approximately 14.9 million dollars to its depositors. ENB had been victimized by the embezzlement of nearly four million dollars by its former president, Douglas J. Shotte, who was arrested shortly after ENB was closed. The embezzlement and closing of ENB was subjected to extensive media coverage. It was the first bank failure in the New York metropolitan area in recent history and was one of the largest single bank embezzlements in the nation's history. On the date of ENB's closing, the Comptroller of the Currency placed the bank in the hands of the Federal Deposit Insurance Corporation (hereinafter FDIC), which was responsible for liquidating ENB and recovering as much cash as possible to *210 repay the amounts owed to ENB's depositors and other creditors. In general, the FDIC uses two methods to meet its obligation to the depositors of a failed bank. The preferred method is to arrange a purchase and assumption transaction whereby another bank purchases certain assets of the failed bank and assumes its deposit liabilities. This method minimizes disruption in deposit relationships and reduces the cost to the FDIC insurance fund. In situations where a purchase and assumption transaction is not feasible, the FDIC will pay off depositors up to the limit of the deposit insurance protection ($20,000 per account in 1970) and liquidate the assets of the closed bank to satisfy both deposit and nondeposit liabilities. In the case of ENB, due to the extent of the embezzlement in relation to the size of the bank, the FDIC determined that a purchase and assumption transaction was impracticable and decided to pay off ENB's depositors and liquidate its assets. On August 13, 1970, the FDIC notified petitioner, as well as several other banks, that the ENB main office building (hereinafter sometimes referred to as the "Eatontown office"), located in Eatontown, New Jersey, and another *211 branch office, located approximately five miles away in Ocean Township, New Jersey, would be transferred to the highest bidder. The successful bidder for the Eatontown office, in addition to acquiring the real property, buildings, and other improvements, was to acquire the right to be on the building's premises for the purpose of soliciting the former ENB depositors as they received their deposit insurance payments from the FDIC. Bids were to be accepted from the notified banks at 2:00 p.m. on August 14, 1970. An FDIC internal memorandum stated the following with respect to the bidding: The high bidder on the main office building will be assured necessary space at that building on Saturday morning (at which time the FDIC will commence payment to insured depositors) assuming that a branch charter has been approved by the appropriate supervisory authorities. * * * Acceptance of bids in no way implies that any branch approval which may be received from the supervisory authority will be exclusive. The high bidder would be permitted to open teller's windows while the FDIC was paying insured depositors. The FDIC decided to allow the high bidder to solicit the former ENB depositors *212 as they were being paid off because it believed that this right had a value for which the bidding banks would pay a premium. Consequently, representatives of the FDIC spoke with representatives of the Comptroller of the Currency and the New Jersey Superintendant of Banks and obtained from them a list of banks in the area that they believed would qualify for branching authorization, if they submitted high bids. Therefore, the FDIC only provided notification of the bidding to those banks that it believed would be authorized to open a branch at the ENB main office building at the time the ENB depositors were paid. [2]
On the afternoon of August 13, 1970, petitioner's officers and directors were notified of the invitation to bid. In order to consider the invitation to bid, petitioner's president, John Hewitt, called a special meeting of the board of directors that evening. At that meeting, petitioner's officers and a directors' committee were appointed to prepare and submit a bid to the FDIC (hereinafter referred to as "the bid committee"). During the special meeting of the *213 board of directors, it was recognized that the opportunity to acquire a substantial amount of deposits in a relatively short period of time through the right to solicit ENB'S depositors would be the determinative factor in formulating a bid and not the value of the Eatontown real estate. The bid committee met on August 14, 1970, to formulate the bid. They had little information on hand concerning the value of the real estate and the total deposits of ENB, and they had no time to acquire additional information. The FDIC had not provided any documentary or oral information concerning ENB to petitioner. In formulating a bid, the bid committee attempted to value the Eatontown office and the right to solicit ENB's depositors from the information available to them. [3] These were the only asserts that the bid committee considered in formulating the bid. They considered the value of ENB's main office building was in a range up to $800,000 and determined its value was approximately $700,000 on the basis of a cursory inspection of the premises made by petitioner's personnel prior to the meeting of the bid committee. To value the right to solicit depositors, the bid committee applied *214 a method commonly used in connection with bank mergers and acquisitions and deposit assumption transactions conducted by the FDIC. Under this method, a premium, reflecting the value of the acquired deposits, is paid for the deposit base. The premium is determined by means of a "rule of thumb" utilized in the banking industry which values the premium as an amount equal to between six and seven percent of the total deposit base. The bid committee used this valuation method because the solicitation right offered the high bidder the opportunity to acquire a deposit base. By exercising the solicitation right, the high bidder would be able to acquire a large deposit base over a short period of time without the need for extensive advertising or other business development. Furthermore, the bid committee knew of no other method under which to value the solicitation right because the sale of ENB's bank premises together with the right to solicit its former depositors was unique to their experience. [4]
*215 In order to value the solicitation right, the bid committee had to estimate the total deposits of ENB and the amounts of those deposits that they believed petitioner could obtain through its solicitation of the former ENB depositors. They estimated that ENB had approximately $16,000,000 in deposits and that petitioner could acquire somewhere between $8,000,000 and $10,000,000 of such deposits. Using the "rule of thumb" applied in bank acquisitions, the bid committee determined that the solicitation right was worth approximately $700,000. On the basis of their estimate of the value of ENB's main office building and the solicitation right, the bid committee authorized Hewitt to submit a maximum bid of $1,500,110 to the FDIC. Hewitt was also authorized to submit a lower bid if he believed that the bidding would be lower, and a total of five bids were prepared for him to carry with him to the bidding. In preparing its bid, the bid committee did not consider goodwill because it believed that ENB had obtained a bad reputation in the community due to the publicity associated with its failure. At 2:00 p.m. on August 14, 1970, petitioner and the other banks submitted sealed bids to *216 the FDIC. The FDIC opened the bids on the same day. Upon ascertaining what the other banks might bid, Hewitt had decided to submit the maximum bid of $1,500,110. Petitioner's bid was the highest bid received. Of the ten bids submitted for the Eatontown office, four, including petitioner's, were one million dollars or greater. Petitioner had applied for permission to establish a branch office at the Eatontown office on August 13, 1970. On August 14, 1970, the Comptroller of the Currency approved petitioner's application to establish a branch office at that location. [5] In 1970, the approval of an application for a branch office normally took approximately 60 days and cost less than $2,000. Since petitioner was an established bank with an excellent record, approval of its application was routine, and due to the unusual circumstances involved, the Comptroller of the Currency expedited the application process. Within four days of the approval of petitioner's branch office application, another bank, Union County Trust Company, received approval to open a branch office in Eatontown. [6]
*217 On Saturday, August 15, 1970, the FDIC began making payments to the former ENB depositors at the Eatontown office. Depositors from the Ocean Township branch office had to come to the Eatontown office to collect their accounts. The FDIC made the payments by check from four teller's windows. Throughout the distribution period, petitioner's personnel were present to solicit new accounts from the former ENB depositors. [7] They were stationed on the floor of the Eatontown office in order to solicit and direct the former ENB depositors to three teller's windows manned by petitioner's representatives. The former ENB depositors had to apply for a new account in order to deposit their money with petitioner. The personnel that petitioner had stationed at the Eatontown office on the morning of August 15, 1970, observed a degree of anxiety among the former ENB depositors. They exhibited hostility towards ENB and uncertainty regarding the prospects of repayment. Indeed, some depositors indicated that they were adverse *218 to opening an account with any bank. Due to the anxiety and hostility of the former ENB depositors, petitioner undertook substantial efforts to dissociate itself from ENB. Some of petitioner's employees circulated among the former ENB depositors as they waited in line for their FDIC payments. These employees answered questions, emphasized the presence of an entirely different bank on the premises, and steered depositors toward other personnel to open new accounts. Furthermore, any banking supplies and materials that bore ENB's name were removed. The FDIC continued making payments to the former ENB depositors from the floor of the Eatontown office for approximately four weeks, and thereafter made payments from the basement of the building for an unspecified period of time. Petitioner actively solicited the former ENB depositors for approximately four weeks, acquiring the bulk of its new accounts in the first week when most of the former ENB depositors were paid. After the FDIC moved to the basement of the building, which was reached by a separate entrance, petitioner had no practical means of soliciting the former ENB depositors or even monitoring the FDIC's activity. By *219 September 18, 1970, a total of 1,755 accounts had been opened at petitioner's new Eatontown branch office with total deposits as follows: Total Accounts
Type of Account
Opened
Total Deposits
Time Deposits
(savings accounts)
1,046
$1,842,692.80
Demand Deposits
(checking accounts)
709
662,934.14
1,755
$2,505,626.94
Petitioner attributed the 1,755 new accounts opened during its first month of operation in Eatontown to the solicitation right that it had acquired from the FDIC. After the first month, at which time the FDIC moved its payment operation to the basement of the building, distributions to former ENB depositors were minimal and impractical to monitor. Petitioner's right to solicit the former ENB depositors enabled it to forego the marketing expense normally needed to obtain such a deposit base. In the commercial banking industry, deposit relationships represent the most favorable source of funds and are one of the most important factors with respect to the profitability of a commercial bank. While banks provide a variety of services in addition to deposit accounts, deposit relationships, and particularly demand deposit relationships, *220 tend to be the focal point for other bank customer relationships. Since the ability of a bank to attract and hold deposits is the main determinative of the scale and scope of its total business, most banking services are geared to holding onto deposit relationships. Therefore, when a customer severs his deposit relationship with the bank, his other relationships with the bank will also tend to be severed eventually. Once a deposit relationship is established it will generally be retained for a period of time with little, if any, need for the bank to engage in further marketing efforts. Nevertheless, deposit relationships eventually terminate because the circumstances of a bank's customers change with time. With respect to individuals, such changes include relocations to other communities, job changes, marriages and divorces, and death. With respect to business customers, such factors include business reorganizations and failures, changes in personnel, and the retirement of owners and other key personnel. Generally, in the banking industry, if a set of deposit relationships is measured in terms of initial balances, one-half of the acquired relationships can be expected to terminate *221 within 7 to 9 years. [8] Some of the deposit relationships can be expected to be retained for longer periods of time; such deposit relationships tend to be associated with larger average balances. On November 13, 1970, title to the Eatontown office was transferred to petitioner. [9] Petitioner's real estate appraisal, dated November 1, 1970, set the value of the land and building at $696,763. [10] The Eatontown office building had much more office space than petitioner needed for a branch office, and, as a result, petitioner has rented a substantial part of the building to other tenants. While petitioner wanted a branch office in the Eatontown area, the specific location of ENB's main office building was no more valuable than a number of other locations. Prior to its failure and closing, ENB *222 had 22 employees. Petitioner hired three of these employees to remain in its Eatontown branch office and hired eight others to work at other branches. Petitioner allocated the $1,500,110 purchase price that it paid to the FDIC between the Eatontown land and building and the right to solicit the former ENB depositors. Petitioner allocated $696,763 to the land and building on the basis of its appraisal and $803,347 to the solicitation right. No portion of the purchase price was allocated to goodwill or going concern value. For tax purposes, petitioner capitalized as the cost of acquiring the 1,755 accounts attributable to the solicitation right the sum of $803,347. This sum was allocated among such accounts as follows: (a) The value of a demand deposit account dollar was determined to be 2.62 times greater than that of a time deposit account dollar, based upon a 1970 Functional Cost Analysis published by the Federal Reserve Bank of New York. (b) The total demand deposits acquired by September 18, 1970 ($662,934.14), were multiplied by the 2.62 factor, for a total of $1,736,887.47. This latter figure was added to the total time deposits acquired by September 18, 1970 ($1,842,692.80), *223 for a total of $3,579,580.25. (c) It was then calculated that $1,736,887.45 is 48.52 percent of $3,579,580.25 and that $1,842,692.80 is 51.48 percent of $3,579,580.25. (d) It was then determined hat 48.52 percent and 51.48 percent of $803,347 is $389,783.96 and $413,563.04, respectively. (e) Finally, the figures arrived at in (d) above were divided by the respective demand and time deposits acquired by September 18, 1970, in order to determine the value of each demand deposit account dollar and each time deposit account dollar: Demand Deposits: $389,783.96 / $662,934.14 = $0.58796 Time Deposits: $413,563.04 / $1,842,629.80 = $0.22443 (f) Therefore, each demand and time account on deposit on September 18, 1970, was multiplied by the appropriate account dollar value determined in (e) above in order to determine the portion of the cost of the solicitation right that should be allocated to each account on the basis of its relative value. As the accounts attributable to the solicitation right were closed, petitioner deducted, and MNM continues to deduct, the amount allocated to acquiring each such account. The deductions are taken only when an account is entirely *224 closed. A reduction in an account balance does not result in a deduction, nor do fluctuations in an account balance result in adjustments to the cost allocated to the account. For the years 1970 through 1980, petitioner and MNM claimed the following deductions on the Schedule G (Depreciation) filed with their tax returns with respect to the individual closings of the 1,755 accounts attributable to the solicitation right: ACCOUNTS CLOSED
Taxable
Demand
Time
Amount
Year
Deposits
Deposits
Total
Deducted
1970
43
43
86
$ 27,854.36
1971
152
228
380
145,088.48
1972
85
133
218
114,226.99
1973
41
79
120
49,313.61
1974
65
88
153
62,339.21
1975
41
66
107
45,857.28
1976
25
52
77
22,189.26
1977
25
55
80
42,096.83
1978
23
26
49
15,572.98
1979
12
41
53
39,015.84
1980
21
32
53
21,392.18
Total
533
843
1376
$584,967.81
In the notice of deficiency, respondent disallowed the deductions claimed for the years in issue. OPINION We must decide whether petitioner is entitled to amortize the amount allocated to the cost of the right to solicit the former ENB depositors. After ENB was closed, the FDIC *225 decided to sell ENB's assets and to pay its depositors to the extent of their deposit insurance protection. The FDIC notified several banks, including petitioner, that it would sell ENB's main office building in Eatontown to the highest bidder.The highest bidder for the Eatontown office would also acquire the right to be on the premises of the building as the former ENB depositors deceived their payments from the FDIC.Petitioner submitted the high bid and acquired both the Eatontown office and the solicitation right. In exercising the solicitation right, petitioner acquired 1,755 accounts from the former ENB depositors. Section 167(a)[11] allows as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear, and obsolescence of property used in the trade or business or held for the production of income.The term "property" includes both tangible and intangible property. Section 1.167(a)-3, Income Tax Regs., provides, in pertinent part, as follows: *226 If an intangible asset is known from experience or other factors to be of use in the business or in the production of income for only a limited period, the length of which can be estimated with reasonable accuracy, such an intangible asset may be the subject of a depreciation allowance. Examples are patents and copyrights. An intangible asset, the useful life of which is not limited, is not subject to the allowance for depreciation. No allowance will be permitted merely because, in the unsupported opinion of the taxpayer, the intangible asset has a limited useful life. No deduction for depreciation is allowable with respect to goodwill. * * * To qualify for an amortization deduction with respect to an intangible asset, the taxpayer must show that the asset (1) has an ascertainable cost, separate and distinct from any goodwill or going-concern value that may have been obtained in connection with its acquisition, and (2) has a limited useful life which can be determined with reasonable *227 accuracy. Houston Chronicle Publishing Co. v. United States,481 F.2d 1240 (5th Cir. 1973); Los Angeles Central Animal Hospital, Inc. v. Commissioner,68 T.C. 269, 273 (1977). Initially, we find that the solicitation right which petitioner acquired from the FDIC must be considered to be equivalent or akin to the acquisition of a customer list.By means of the solicitation right, as with the customer list, petitioner acquired access to a group of potential customers. The solicitation right gave petitioner the opportunity to solicit deposits from ENB's former depositors. By exercising the right, petitioner acquired an identifiable group of depositors, many of whom would continue as petitioner's customers for a period in excess of one year, thereby establishing a depositor base for petitioner's Eatontown branch office. To that extent, the solicitation right is a separate and distinct asset with a useful life in excess of one year and, accordingly, must be treated as a capital asset, the cost of which is not deductible as a business expense in the year of acquisition. See Manhattan Company of Virginia, Inc. v. Commissioner,50 T.C. 78, 86 (1968). *228 [12]
Respondent maintains that petitioner is not entitled to any amortization or depreciation deduction under section 167(a) for the amount it allocated to the cost of the solicitation right. It is respondent's position that no part of the amount which petitioner paid to the FDIC in excess of the fair market value of the Eatontown office, that is, $803,347, is allocable to the solicitation right, but instead must be attributed to various intangible assets in the nature of and inseparable from goodwill. Respondent contends that "the excess payment" is attributable to the following intangible assets, among others: (1) the acquisition of an advantageous location with an established banking facility in a growing area; (2) the expectation that many of ENB's former depositors would return to a location *229 with which they were familiar; (3) immediate branch office approval from the Comptroller of the Currency; (4) the retention of 11 of the former employees of ENB; and (5) the expectation of future profit. Furthermore, respondent contends that some portion of the excess payment should be attributed to the going-concern value of ENB. According to respondent, even though the transaction did not entail the acquisition of a going concern in the strictest sense of the word, the substance of the transaction is similar enough to require the same treatment. Even assuming that some part of the excess payment is allocable to the solicitation right, respondent argues that the "mass asset" rule bars any amortization of its cost because the solicitation right is inextricably linked to goodwill and possesses the same qualities as goodwill. Petitioner, on the other hand, contends that the solicitation right constitutes an intangible asset that is separate and distinct from goodwill or any other nonamortizable intangible asset and has a limited useful life that can be ascertained with reasonable accuracy. For the reasons set forth below, we hold for petitioner. *230 Goodwill represents the expectancy that "old customers will resort to the old place" of business. Houston Chronicle Publishing Co. v. United States,481 F.2d 1240, 1247 (5th Cir. 1973); see also VGS Corp. v. Commissioner,68 T.C. 563, 590 (1977). The essence of the concept of goodwill is a pre-existing business relationship founded upon a continuous course of dealing that can be expected to continue indefinitely. Computing & Software, Inc. v. Commissioner,64 T.C. 223 (1975). A thorough definition of goodwill has been set forth as follows: [T]he advantage or benefit, which is acquired by an establishment beyond the mere value of the capital, stock, funds, or property employed therein, in consequence of the general public patronage and encouragement which it receives from constant or habitual customers, on account of its local position, or common celebrity, or reputation for skill or affluence, or punctuality, or from other accidental circumstances or necessity, or even from ancient partialities or prejudices. [Metropolitan Bank v. St. Louis Dispatch Co.,149 U.S. 436, 446 (1893).]
*231 In sum, goodwill exists where is an "expectancy of both continuing excess earning capacity and also of competitive advantage or continued patronage." Wilmot Fleming Engineering Co. v. Commissioner,65 T.C. 847, 861 (1976). [13]
Going-concern value, as distinguished from goodwill, constitutes "the additional element of value which attaches to property by reason of its existence as an integral part of a going concern." VGS Corp. v. Commissioner,supra at 591. It is characterized by the ability of an acquired business to continue to operate and generate income without interruption during and after acquisition. Solitron Devices, Inc. v. Commissioner,80 T.C. 1, 19-20 (1983), on appeal (11th Cir. April 8, 1983); VGS Corp. v. Commissioner,supra at 592.Both the goodwill and going-concern value of a business constitute nonamortizable intangible assets. See Computing & Software, Inc. v. Commissioner,supra. *232 Upon reviewing the entire record, we conclude that petitioner acquired no goodwill or going-concern value in connection with the transaction under consideration. The FDIC offered petitioner, and several other banks, the opportunity to submit a bid for ENB's main office building in Eatontown and a branch office in Ocean Township, New Jersey, making it clear that the high bidder for the main office building would also acquire the right to solicit deposits from the former ENB depositors as they received their FDIC deposit insurance payments.The FDIC offer included the solicitation right in the transaction because it believed that it would receive a premium for the solicitation right. The record contains no indication whatsoever that either the FDIC or petitioner believe that there was any remaining goodwill connected with ENB's property. To the contrary, the record shows that petitioner did not even consider goodwill in formulating its bid for the property because it had reached the none-too-difficult conclusion that a bank which had failed and had been closed had no goodwill to offer. Moreover, we believe that the FDIC used the solicitation rights to enhance the value of the *233 property because it recognized that the sale would not generate any premium attributable to goodwill. The fact that neither petitioner nor the FDIC even considered goodwill in connection with the transaction indicates that there was no goodwill associated therewith. Wilmot Fleming Engineering Co. v. Commissioner,supra at 860. We reject respondent's attempts to attribute the portion of the purchase price in excess of the fair market value of the Eatontown office to "various intangible assets" other than the solicitation right. It is clear that petitioner considered only two assets--the Eatontown office itself and the solicitation right--in formulating its bid. Due to the short period of time which petitioner had to prepare a bid and the uniquencess of the transaction, the methodology that petitioner used in preparing the bid was understandably inexact. Nevertheless, we find petitioner's approach reasonable and acceptable under the circumstances.
The bid committee estimated that the value of the Eatontown office building was approximately $700,000, but, as testimony in the record indicates, considered it possible that the building might have a value of as *234 much as $800,000. To value the solicitation right, the bid committee applied a method commonly used in connection with bank mergers and acquisitions and deposit assumption transactions. In such transactions, a premium is paid for the acquired deposits. The premium is customarily set by a rule of thumb to be between six and seven percent of the total acquired deposit base. In order to determine the appropriate premium, however, the bid committee had to estimate the total deposits which petitioner would be able to acquire through exercising the solicitation right. They estimated that petitioner would acquire approximately $8,000,000 to $10,000,000 in deposits from the solicitation right and, therefore, determined that it would have a value of approximately $700,000. Although hindsight reveals that the bid committee's estimation of the total deposits which petitioner would acquire was considerably high, the error is understandable in view of the fact that the bid committee had no prior experience upon which to rely. On the basis of the bid committee's valuation of the Eatontown office and the solicitation right, a range of bids were prepared with a maximum authorized bid of $1,500,110, *235 reflecting the bid committee's highest estimate of the value of the Eatontown office and the solicitation right. Upon ascertaining what the other banks might bid, petitioner's president decided to submit the maximum authorized bid which proved to be the high bid. In addition to petitioner's bid, there were three other bids in excess of $1,000,000. Although respondent has ascribed considerable value to the location of the Eatontown office and his expectation that the former ENB depositors would return to that location, the record fails to support him. We cannot find that any value should be allocated to the location of the Eatontown office building in excess of its appraised fair market value. While the Eatontown office was undoubtedly a satisfactory location for a branch office, the record establishes that there were other locations that would have served petitioner just as well. In fact, the Eatontown office was too big for a branch office, thereby requiring petitioner to unnecessarily tie-up funds in fixed assets. In asserting that the former ENB depositors could be expected to return to a location with which they were familiar, respondent has attached an unsupportable *236 degree of importance to the location of the Eatontown office. If anything, the Eatontown office occupied a location which many of the former ENB depositors would find much too familiar. It would stand as a constant reminder of ENB, the bank whose failure created an unpleasant, if not traumatic, experience for many of ENB's former depositors. If they did return to the Eatontown office to use petitioner's new branch office facility, it would be because of petitioner's name and reputation and would have no connection whatsoever with ENB. Furthermore, we find no basis for allocating any portion of the purchase price to petitioner's alleged purchase of immediate branch office approval from the Comptroller of the Currency. After the FDIC decided to allow the high bidder for the Eatontown office to solicit the former ENB depositors as they received their deposit insurance payments, its representatives spoke with representatives of the Comptroller of the Currency and the New Jersey Superintendant of Banks in order to obtain a list of banks that would probably qualify for branching authorization. Since the right to solicit the former ENB depositors would be worthless if the high bidder *237 was not authorized to open a branch at the Eatontown office, the FDIC only provided notification of the bidding to banks that it had discovered would be likely to receive the necessary authorization. Although both the FDIC and the bidding banks undoubtedly believed that the high bidder would receive branch office approval, the FDIC could not and did not guarantee any such approval to those banks. The approval of petitioner's branch office application was routine because it was an established bank with an excellent record. The Comptroller of the Currency simply expedited the application process because of the peculiar circumstances involved. The fact that another bank, the Union County Trust Company, received approval to open a branch office in eatontown within four days of the approval of petitioner's branch office application militates strongly against the conclusion that petitioner paid any portion of the purchase price for immediate branch approval. In addition, after ENB's failure, the Eatontown community undoubtedly found itself with reduced banking resources, and the swift approval of the branch office applications filed by petitioner and the Union County Trust Company addressed *238 the community's needs. To the extent that petitioner received branch office approval earlier than it might have otherwise, such approval is simply an inseparable element of the solicitation right because without it that right would have been worthless. [14]
We think that respondent's assertion that some portion of the purchase price is attributable to the former ENB employees that petitioner hired is without merit. Petitioner only hired three of ENB's former employees to work at its new Eatontown branch office, while it hired eight others to work at other branch offices. We are unable to discern any connection between petitioner's acquisition of the Eatontown office and the solicitation right and the hiring of 11 of ENB's former employees. Whether or not petitioner had been the high bidder for the *239 Eatontown office, it could have, and we believe probably would have, hired some of ENB's former employees. It is unlikely that petitioner often found itself with the opportunity to meet its hiring needs from a substantial pool of experienced bank employees. We also refuse to allocate any portion of the purchase price to the nebulous intangible asset that respondent has termed the expectation of future profit. Although petitioner clearly believed that it could use the solicitation right to attract customers and generate a profit, the acquisition of an asset that will attract customers is not goodwill. Indiana Broadcasting Corporation v. Commissioner,41 T.C. 793, 807 (1964), rev'd on other grounds 350 F.2d 580 (7th Cir. 1965). Any expectation of profit that petitioner acquired adhered to the solicitation right; it cannot be treated as a separate element of value acquired pursuant to the transaction. It was through exercising the solicitation right that petitioner expected to acquire valuable deposits from which it would earn a profit. Finally, we reject respondent's argument that petitioner acquired some going-concern value pursuant to its acquisition *240 of the Eatontown office because such a contention merely repeats the erroneous and illusory view underlying all of respondent's other arguments that we have already addressed and rejected. Regardless of the fact that ENB had failed and was closed by the Comptroller of the Currency, respondent has insisted upon treating petitioner's purchase of the Eatontown office and solicitation right as the acquisition of a viable, ongoing enterprise. To find that petitioner acquired a going concern would stretch the term so far as to leave it without meaning. ENB was not a going concern, it no longer existed, and had no remaining goodwill to be acquired. [15] If anything, ENB's failure and the subsequent adverse publicity left petitioner with a good deal of badwill to overcome in soliciting the former ENB depositors. ENB was dead, and petitioner was required to exert considerable effort to cleanse itself of the stench of the decomposing corpse. While waiting to receive their deposit insurance payments, many of the former ENB depositors exhibited a degree of anxiety or hostility and some indicated *241 that they were reluctant to deposit their funds in any bank. In soliciting the former ENB depositors, petitioner's employees stressed that petitioner was a completely different bank. Every effort was made to remove all evidence of ENB's existence from the premises. Nevertheless, the fact that the former ENB depositors were on the premises of petitioner's new branch office to pick-up their deposit insurance payments stood as a foreboding reminder of ENB. Since petitioner acquired only $2,500,000 in deposits when it had estimated that it would acquire approximately $8,000,000 to $10,000,000 in deposits, the evidence compels us to conclude that petitioner faced an uphill battle in soliciting the former ENB depositors. Since petitioner acquired no more than the Eatontown office and the solicitation right, [16] which we have found to be equivalent to a customer list, we believe that the instant case is squarely within the parameters of our decision in Manhattan Company of Virginia, Inc. v. Commissioner,supra. Nevertheless, respondent has argued that the "mass asset" rule bars any amortization of the cost of the solicitation right. The "mass asset" or cindivisible *242 asset" rule has been applied to deny amortization where seemingly separate assets are inextricably linked to goodwill or possess the same qualities as goodwill in that they are self-regenerating and have no determinable useful life. Houston Chronicle Publishing Co. v. United States,supra at 1249. Generally, in such instances, the taxpayer had acquired a goingconcern whose goodwill and going-concern value represented the most valuable elements of the acquisition. In Manhattan Company of Virginia, Inc., the taxpayer *243 purchased the names and addresses of a number of home pickup and delivery laundry customers from another laundry company. The customer lists were not acquired as a part of a going business; the taxpayer received no right to use the other laundry company's name, but acquired only the customer list and a covenant not-to-compete from the laundry company and its principal officers. In holding that the taxpayer was entitled to amortize a portion of the cost of the customer list, we stated: There is nothing in any of the cases to which our attention has been directed to require a conclusion that where a customer list is acquired as an asset separate from a going concern or the name or goodwill of the seller's business, the asset by its very nature is not subject to depreciation. * * * If there is some element of goodwill or other nondepreciable value acquired in connection with the acquisition of a customer list which otherwise has a limited useful life in the taxpayer's business, there is no reason why the purchase price should not be allocated between the nondepreciable portion and depreciable portion of the asset when the record contains sufficient facts to permit such an allocation. *244 * * * Certainly the fact that the information on a customer list is considered as one asset and not a conglomerate of several hundred or several thousand individual assets, each with a separate useful life, does not require that there be no segregation between the portion of the asset which has an ascertainable useful life and the portion with a continuing value in the nature of goodwill which does not have an ascertainable useful life. [50 T.C. 90-91]
In the instant case, as in Manhattan Company of Virginia, Inc., the transaction in issue did not entail the acquisition of a going concern. Aside from the component, if any, of nonamortizable value inherent in the solicitation right, the record demonstrates that the solicitation right is a wasting asset with an ascertainable useful life. [17] Eventually, the customers that petitioner acquired through exercising the solicitation right will terminate their relationship with petitioner. Therefore, in accordance with our reasoning in Manhattan Company of Virginia, Inc., we must determine what, if any, portion of the cost of the solicitation right is allocable to some element of nonamortizable value. *245 On the record before us, we conclude that ten percent of the cost of the solicitation right is allocable to an element of nonamortizable value. [18] In Manhattan Company of Virginia, Inc., we determined that 25 percent of the purchase price of the customer lists were allocable to a nonamortizable element of continuing value with an indefinite useful life. In that case, however, the taxpayer acquired the customer list from an ongoing business entity that was providing current service to the customers on such lists; there is no indication that there was any adversity involved in the taxpayer's acquisition of the list or that the taxpayer had any ill-will to overcome in soliciting the customers thereon.Such is not the case herein. ENB's failure left a bleak aura surrounding ENB and anything connected with it. In occupying ENB's former premises, petitioner had to make it clear that it was in no way connected with ENB. While the solicitation right gave petitioner access to prospective depositors, it was petitioner's own efforts and goodwill that allowed it to acquire any of their deposits. *246 In Manhattan Company of Virginia, Inc., the taxpayer gradually took over the customers of the laundry company from which it had purchased the customer lists, utilizing the satisfactory service record of that company and the fact that it was stepping into its place in an effort to retain its customers. Clearly, a portion of the purchase price therein was allocable to goodwill. This is readily distinguishable from the instant case where we have found that petitioner acquired no goodwill and any connection drawn between petitioner and ENB could only have been detrimental. Beyond the access to the depositors that the solicitation right afforded petitioner, the deposits that petitioner acquired are largely attributable to its own efforts and satisfactory service record. Although the cost of the solicitation right is amortizable to the extent determined above, we must reject the method of amortization that petitioner has employed. Petitioner's method of amortization allocated a portion of the cost of the solicitation right to each of the 1,755 acquired accounts based on its determination of the value of each such account. On the basis of this allocation, petitioner claims a deduction *247 under section 167 for the amount allocated to each such account in the year in which the account is closed. We have previously considered and rejected such a method of amortization. See Manhattan Company of Virginia, Inc. v. Commissioner,supra.Essentially, petitioner's method of amortization uses hindsight to determine the time at which deductions will be claimed. Since "amortization is an advance estimate of the proper period for writing off an expense" which must be determined before all the facts are known, petitioner's method of amortization is unacceptable. Kentucky Central Life Insurance Co. v. Commissioner,57 T.C. 482, 501-502 (1972). [19]
Accordingly, petitioner must amortize the cost of the solicitation right over its useful life. The record indicates that between 10 and 15 percent of petitioner's accounts close each year. Moreover, as a general rule, if a set of deposit relationships is measured in initial balances, one-half of the acquired relationships can be expected to terminate within *248 seven to nine years. On the basis of this and other evidence in the record, we find that the group of accounts which petitioner acquired through exercising the solicitation right have a life of approximately 14 years. Therefore, we hold that the cost of the solicitation right must be amortized over a 14-year useful life. See Manhattan Company of Virginia, Inc. v. Commissioner,supra.
To eflect the foregoing, Decision will be entered under Rule 155.
Footnotes
1. The deficiency for 1966 is attributable to a reduction in the net operating loss carryback from 1976.↩
2. The FDIC could not and did not guarantee that the high bidder would receive branch office approval.↩
3. Petitioner was not interested in acquiring ENB's Ocean Township branch office because there was no right to solicit depositors associated therewith. Accordingly, the bid submitted with respect thereto was a nominal one. ↩
4. At the time that petitioner was formulating its bid, it appears that there had been only two recent cases in which another bank had occupied the premises of a failed bank while the FDIC was making deposit insurance payments at the same location--one in 1967 and another in 1970. Since these banks were quite small, neither failure would have been likely to attract any attention outside of the communities involved.↩
5. In considering the branch office applications of a national banking association, the Comptroller of the Currency is required to act in accordance with the state law applicable to state banks. 12 U.S.C. sec. 36(c) (1976). Under New Jersey law, a bank was prohibited from opening a branch office in a municipality in which another bank had its principal office. N.J. Stat. Ann. sec. 17:9A-19↩. Thus, prior to ENB's failure, petitioner was prohibited from opening a branch office in Eatontown. 6. On September 4, 1970, petitioner filed a suit in the Superior Court of New Jersey, Chancery Division, Monmouth County, requesting that the Union County Trust Company be enjoined from operating a branch office anywhere in Eatontown. Petitioner had filed this suit in the hope of temporarily preventing any of ENB's former depositors from opening an account at another bank after they were paid by the FDIC.↩
7. Although petitioner's representatives asked the FDIC for depositor information, they never received a list of the former ENB depositors or any other such information.↩
8. Petitioner's experience indicates that approximately 10 to 15 percent of its accounts close each year.↩
9. On February 18, 1971, the furniture and fixtures in the building were purchased from FDIC in a separate transaction for a total price of $4,750. ↩
10. A real estate appraisal dated August 17, 1970, arranged by the FDIC set the value of the land and building at $600,000.↩
11. Unless otherwise indicated, section references are to the Internal Revenue Code of 1954, as amended.↩
12. Petitioner's original brief asserted, as an alternative argument, that the cost of the solicitation right was deductible as a promotional expense under sec. 162(a) in the year incurred, relying on NCNB Corp. v. United States,684 F.2d 285↩ (4th Cir. 1982). On reply brief, however, petitioner conceded that the cost of the solicitation rights was a capital expenditure.
13. See also Solitron Devices, Inc. v. Commissioner,80 T.C. 1↩ (1983), on appeal (11th cir., April 8, 1983).
14. Respondent asserts that it is not clear whether the bar that New Jersey law erected against another bank opening a branch office in a municipality in which a bank had its principal office was lifted when ENB failed. Such an argument is without merit. When ENB failed and was liquidated, the bar interposed by New Jersey law was lifted. N.J. Stat. Ann. sec. 17.9A-19B↩. (2).
15. See Savings Assurance Agency, Inc. v. Commissioner,T.C. Memo. 1963-52↩.
16. Petitioner determined that the 1,755 accounts it acquired by September 18, 1970, were attributable to the exercise of the solicitation right. The record indicates that by that time more than 90 percent of the former ENB depositors had collected their deposit insurance payments. After that date, the FDIC moved its payment operation to the basement of the building and it became impracticable for petitioner to continue soliciting depositors. Under these circumstances, we consider petitioner's use of September 18, 1970, as the cut-off date for accounts it would attribute to the exercise of the solicitation right to be appropriate.↩
17. Respondent maintains that that solicitation right is not a wasting asset. In so doing, he has relied on the fact that in 1980 the total deposits at the Eatontown branch office attributable to former ENB depositors equalled $2,811,137.35, which constitutes 112 percent of the total account balance as of September 18, 1970 ($2,505,629.94). In this figure, however, respondent not only includes the accounts of those depositors whose accounts at the Eatontown office are attributable to the solicitation right, but also includes the accounts of former ENB depositors who opened such accounts after September 18, 1970, the time at which the FDIC moved its payment operation to the basement of the Eatontown office. See note 16 supra. This represents a distortion of the issue under consideration herein. We are concerned with the amortizability of the cost of the solicitation right, and the resolution of this issue revolves around the character of the deposit accounts acquired through the use of the solicitation right. The fact that other former ENB depositors may have been lured to the Eatontown office through further marketing or promotional efforts on petitioner's part is irrelevant. Furthermore, the fact remains that as of 1980 a total of 1,376 of the original 1,755 accounts had been closed. At that time, the deposit balance attributable to such accounts was $1,611,279.86 or 64 percent of the original total deposit balance. In constant dollars, however, the total deposit balance as of 1980 was approximately $760,000, or 30 percent of the original total deposit balance.↩
18. The principal nonamortizable element value connected with the solicitation right is the longevity of larger accounts. Although respondent argues that the other customer services that depositors could be expected to use (e.g., loans and safety deposit boxes) represent a nonamortizable element of value, we do not agree. First, we believe that any such overlap is to some extent due to petitioner's efforts to provide a satisfactory level of service. Second, and more importantly, the record shows that deposit relationships are the focal point of all bank-customer relations and when severed tend to result in the termination of all other bank-customer relationships.↩
19. See Holden Fuel Oil Co. v. Commissioner, T.C. Memo. 1972-45, affd. 479 F.2d 613↩ (6th Cir. 1973).