**SOUTHERN BANCORPORATION, INC.,**
**Plaintiff–Appellant,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Defendant–Appellee.**

No. 87–2554.

United States Court of Appeals,
Fourth Circuit.

Argued Jan. 4, 1988.

Decided May 16, 1988.

Robert Harold Hishon (William R. Asbell, Jr., Hishon & Ranney, Atlanta, Ga., on brief), for plaintiff-appellant.

Jonathan S. Cohen, Tax Div., U.S. Dept. of Justice (Michael C. Durney, Acting Asst. Atty. Gen., Michael C. Paup, Francis M. Allegra, Tax Div., Dept. of Justice, Washington, D.C., on brief), for defendant-appellee.

Before RUSSELL and CHAPMAN, Circuit Judges, and BUTZNER, Senior Circuit Judge.

CHAPMAN, Circuit Judge:

·Southern Bancorporation, Inc. ("Southern")[1] appeals the December 31, 1986 decision of the United States Tax Court holding that the premium paid to the Federal Deposit Insurance Corporation ("FDIC") for the acquisition of certain assets and the assumption of certain liabilities of American Bank and Trust Company ("American"), a failing bank, is not amortizable. The Tax Court also held that Southern's claim is collaterally estopped by this court's decision in *Southern Bancorporation, Inc. v. United States*, 732 F.2d 374 (4th Cir. 1984), *cert. denied*, 469 U.S. 1207, 105 S.Ct. 1169, 84 L.Ed.2d 321 (1985) ("*SBC I*"). The Tax Court's decision confirmed deficiencies totaling $1,952,954 assessed by the Commissioner of Internal Revenue ("Commissioner") for the tax years 1975–78. For reasons that follow, we question the Tax Court's holding that Southern's claim is collaterally estopped by *SBC I*, but we affirm the Tax Court's holding that Southern failed to prove that the assets in ques-

tion are amortizable under the Internal Revenue Code.

## I

During the early part of September 1974, it became public knowledge that American was experiencing serious financial difficulties. To prevent a financial crisis, the FDIC approached Southern and several other financial institutions to solicit their participation in bidding for American's assets and liabilities. American had obtained a line of credit from the FDIC to meet its cash needs while the FDIC put together a "bid package" setting forth the terms of the sale. The FDIC would withdraw some $61 million of American's loans determined to be in default or of questionable value, leaving assets estimated at $83.2 million and liabilities estimated at $136 million. The difference between the value of these remaining assets and the liabilities to be assumed was to be compensated by cash provided by the FDIC. This cash payment, however, was to be reduced by the amount paid to acquire American, which was referred to as the "premium." The bid package further provided that the purchasing bank "will, to the extent permitted by law, succeed to [American's] business." As in all such attempts to rescue a failing bank, the FDIC's objectives were to continue the operation of the bank as a going concern and to avoid a loss of confidence on the part of depositors.

After being advised on Wednesday, September 18, 1974 of the imminent sale, Southern's officers began evaluating available information to determine the amount Southern should bid for American. On Thursday, September 19, 1974, the FDIC informed its potential bidders that American would be closed the following day by South Carolina banking authorities, who would tender receivership to the FDIC. The purchaser would be required to assume the operation of all branches of

---

**1.** First Union Corporation, a North Carolina based multi-bank holding company, acquired all the issued and outstanding common stock of Southern on March 31, 1986 and subsequently changed Southern's name to First Union Corporation of South Carolina. For clarity and consistency, we refer to the entity as "Southern."

American and open them for business on Monday morning, September 23, 1974.

Based on figures from the recent purchase of U.S. National Bank from the FDIC by Crocker National Bank in San Francisco, Southern determined that a bid premium of five percent of American's estimated deposits would be necessary to be successful. This amounted to a premium of $5,560,000 representing just under five percent of American's $112 million of deposits, which consisted almost entirely of checking and savings accounts. To test the profitability of the acquisition at this bid price, Southern estimated the income and expenses of its first year of operating American's banking business, which indicated an after-tax profit of $240,100. Southern then determined that if it amortized the $5,560,000 premium over forty years (a yearly amortization of $137,500), there would be a net profit of $102,600.

The bid was submitted on Friday, September 20, 1974. Within a few hours, the FDIC announced that Southern was the successful bidder. A purchase agreement was executed that evening by the parties. Measures were taken over the weekend to assure the successful Monday morning opening of the acquired American branches. State officials issued press releases reassuring the public, and television, newspaper and radio advertising further assured depositors that their funds were safe.

After the purchase of American was completed, Peat, Marwick, Mitchell & Company, Southern's accounting firm, examined the relevant records and concluded that, because of its high quality, the loan portfolio acquired from American had a fair market value in excess of its face amount. Utilizing a methodology developed by Peat Marwick, Southern determined the loan portfolio had a fair market value of $4,993,940 in excess of its stated or book value, and accordingly that $4,993,-940 of the $5,560,000 purchase premium had been paid for the loan portfolio. Southern decided this "loan premium" should be amortized ratably over the useful life of the installment and commercial loan components of the portfolio, determined to be 20.91 months and 4.38 years, respectively. The remainder of the purchase premium, $566,060, was allocated to non-amortizable goodwill.

On its consolidated tax return for 1974, Southern deducted $589,241 as "Amortization of Loan Premium," representing that year's amortization of the $4,933,940 amount. That deduction, together with other deductions, resulted in a net claimed operating loss for 1974, which Southern sought to carry-back to proceeding taxable periods. The Commissioner, however, issued a statutory notice of deficiency with respect to the tax year 1974. Southern paid the resulting deficiency and filed claims for refund, which the IRS denied.

Southern then filed suit for refund in the United States District Court for the District of South Carolina. In its complaint, Southern alleged that the loan portfolio acquired from American had an actual economic value of $4,993,940 in excess of its stated value and that it was entitled to amortize the amount on its federal income tax returns over the useful life of the loan portfolio. Southern alleged in the alternative that: (1) any portion of the purchase premium that was not allocable to American's loan portfolio was allocable to the acquired deposits of American, (2) the "deposit base" [2] was of valuable asset because

2. While deposits are classified as a liability for financial accounting purposes, they also represent an intangible asset and provide a source of relatively inexpensive funds to the bank. Throughout this litigation various terms have been used to identify this asset, including "core deposit base," "core deposit relationships," "core deposits," "customer deposit relationships" and "deposit liabilities." While we recognize that the term "core deposits" has been defined by the Comptroller of the Currency as "[t]he deposit base of demand and savings accounts which, while usually not legally restricted, are generally based on stable customer relationships so that the bank can expect use of these funds for an extensive period of time, often many years," Comptroller of the Currency, Administrator of National Banks, *Banking Circular 164* (December 29, 1981), in an effort to be consistent with our previous opinion and Southern's pleadings, we use the term "deposit base" to refer to the aggregate of deposit accounts which Southern

it represented a source of inexpensive funds, (3) the deposit base did not have a useful life greater than ten years, and (4) Southern should be entitled to amortize the amount allocated to the deposit base over its useful life.

The district court accepted the method used by Southern to determine the loan portfolio's fair market value and its useful life. The court found that "Southern acquired no goodwill in the traditional sense," but agreed that the evidence did "suggest" that some portion of the premium could be attributed to the acquired deposit base and banking locations. The district court concluded that Southern had carried its burden in establishing with reasonable accuracy the life of the loan portfolio as a depreciable asset.

This court reversed in *SBC I* finding that Southern's attempt to increase the bases of the loan portfolios was wholly *post hoc.* This court held that Southern did not introduce sufficient evidence to establish the increased value of the loan portfolio. 732 F.2d at 377–78.

On its consolidated income tax returns for 1975 through 1978, Southern again reported deductions for "Amortization of Loan Premium," representing the respective years' amortization of the $4,993,940 amount. Again, the Commissioner issued a notice of deficiency.

Southern then filed this case in the Tax Court, alleging that it properly amortized the purchase price paid for American in excess of the fair market value of the tangible assets and securities, the face amount of American's loan portfolio and goodwill. Consistent with its returns, Southern averred that it was entitled to a "deduction for amortization ... of the actual economic value of the loan portfolio over its carrying value." Southern also alleged, in the alternative, that $4,202,361 of the purchase price was allocable to the deposit base and could be amortized over its finite useful life of less than ten years.[3] At trial, Southern amended its petition, deleting all references to amortization of the loan portfolio, while re-alleging as its primary argument various contentions regarding the deposit base.

Testimony at trial indicated that Southern first investigated the allocation of the purchase premium to the deposit base in 1978. Southern's management was not aware of any method used in the banking community to value the deposit base, and it was not until 1978 or 1979 that the topic began to appear in the professional literature. Southern introduced a report prepared in 1984 by Bruce W. Morgan, a consultant with Golembe Associates, Inc., which provides consulting services to financial institutions. Morgan had participated in the post-acquisition valuation of deposit bases in approximately sixty transactions. In the report, Morgan valued the deposit base acquired from American at $5,491,996 above its stated value.[4] The report also contained an amortization schedule for this "deposit base premium" in which Morgan estimated the time it would take for the value attributable to the deposits to dissipate.

\* \* \* \* \* \*

(xxvii) The portion of the purchase price which may, in the alternative, be allocated to the deposit base is $4,202,361.

(xxviii) The Deposit Base has a readily determinable and finite useful life.

\* \* \* \* \* \*

(xxx) The Deposit Base acquired by Petitioner did not have a useful life greater than 10 years.

---

acquired from American, totaling approximately $112 million.

3. Southern alleged, in pertinent part:

(xxii) In the alternative, if any portion of the [purchase premium] ... is allocable to assets other than the value of the [American] loan portfolio, such amount is also amortizable.

(xxiii) One of the liabilities assumed by Petitioner in the [American] acquisition was the obligation of the [American] to its depositors in the amount of $112,702,998 (the "Deposit Base").

(xxiv) The Deposit Base, while classified as a liability for financial accounting purposes, is an asset, the value of which can be ascertained.

4. Morgan based his opinion on the assumption that the deposit base totaled $81 million. *See* note 2, *supra.*

To prepare the amortization schedule, Morgan used data from a survey of all transaction account closings occurring during the five-month period from February 1, 1984 through June 30, 1984 at branches that had been acquired from American. Current data were used because no account closing data were available for the period contemporaneous with American's acquisition. Morgan visited each of the American sites and communities. He determined that since the longevity characteristics of deposit relationships tend to be determined by the circumstances of the customer, and changed, if at all, only gradually over time, the longevity characteristics observed from the 1984 data would not have been significantly different had the sample been composed of account closings during 1974.

The Commissioner's expert, John P. Hoffman, while not experienced in the financial analysis of banks, or customers deposit relationships, is an expert in the market evaluation of businesses. Hoffman testified that the deposit base is not a separable asset from the going concern and goodwill value inherent in the acquired bank. Hoffman also testified at length regarding what he believed were deficiencies in the Morgan report, including, that in determining the useful life of the deposit base, the report failed to distinguish between savings and checking accounts, and among individual, government and commercial accounts. Hoffman also questioned the use of data collected in 1984 to evaluate the deposit base as of 1974.

The Tax Court held that Southern failed to meet its burden of proving the useful life of the deposit base. The Court observed that the Morgan study violated the rule against using hindsight evidence to support a claim for amortization, because it relied on data from a year after the tax years in question. The Court observed that this case was controlled by *Banc One Corp. v. Commissioner*, 84 T.C. 476 (1985), *aff'd*, 815 F.2d 75 (6th Cir.1987), in which the Tax Court similarly rejected the taxpayer's reliance on hindsight statistics in its attempt to prove the useful life of a deposit base. The Court also observed that Southern had not seriously argued that the

useful life of the deposit base could be determined from industry experience, finding, nonetheless, that the evidence would not support such a claim if made.

The Tax Court also held that Southern is collaterally estopped from arguing that any portion of the premium paid to acquire American is amortizable. It stated that "the issue in this case is whether [Southern] is entitled to amortization deductions for some portion of the premium paid to acquire [American]. That issue was raised and litigated in the refund suit [referring to *SBC I*]." Noting that Southern had raised the deposit base issue in *SBC I* as an alternative allegation for relief, but did not pursue the issue at trial or prove the alternative allegation, the Tax Court further found that Southern "cannot remove the issue from a case by failing to argue it and thereby preserve the opportunity to litigate the question in a subsequent proceeding after failing to obtain a favorable decision on those legal theories argued."

## II

█ We question the Tax Court's conclusion that Southern is collaterally estopped from supporting its amortization deduction for the tax years 1975–78 with the argument that a portion of the premium paid to acquire American can be allocated to the deposit base and properly amortized over the finite useful life of this intangible asset. For an issue to be precluded by collateral estoppel, the question must have been "distinctly put in issue and directly determined" in a prior proceeding. *Southern Pacific R.R. v. United States*, 168 U.S. 1, 48, 18 S.Ct. 18, 27, 42 L.Ed. 355 (1897). Most recently, the Supreme Court has stated that an issue must have been conclusively determined in a prior action to be precluded by collateral estoppel. *United States v. Stauffer Chem. Co.*, 464 U.S. 165, 170–71, 104 S.Ct. 575, 578, 78 L.Ed.2d 388 (1984). Therefore, the identical issue must have been actually litigated in the prior case and the issue must have been decided by the court before collateral estoppel can be applied. *Moore v. United States*, 360 F.2d 353 (4th Cir.1965), *cert. denied*, 385

U.S. 1001, 87 S.Ct. 704, 17 L.Ed.2d 541 (1967).

As distinguished from res judicata, collateral estoppel does not create a bar as to issues which *might have been litigated* and determined in the first proceeding, but were not. *Commissioner v. Sunnen,* 333 U.S. 591, 598–99, 68 S.Ct. 715, 719–20, 92 L.Ed. 898 (1948). In tax cases, res judicata is rare, since a prior income tax judgment could only bar a subsequent proceeding involving the same claim in the same tax year.

The *SBC I* litigation concerned only the 1974 tax year; the present case concerns amortization deductions taken for the tax years 1975–78. Clearly, res judicata would bar Southern's present claim if the 1974 tax year was still at issue. Since different tax years are now in question, the issue is not whether Southern should have argued in *SBC I* that the deposit base premium is amortizable, but whether that issue was distinctly raised and directly decided.

The Commissioner argues that in *SBC I* this court decided the issue whether any portion of the premium paid to acquire American was amortizable, and the contention that a portion of the premium was allocable to American's deposit base, though not expressly raised in that appeal, was subsumed in the larger issue. The Tax Court undoubtedly found this argument convincing.

This court noted, however, in the *SBC I* opinion that

[Southern's] complaint raised, as an alternative ground for relief, the issue of amortizing the deposit base. However, [Southern] did not pursue the issue at trial and prove its alternative allegations that it paid $4,202,361 for the deposit base, and that the deposit base had a useful life of less than ten years.

732 F.2d at 376 n. 2. Referring to the deposit base contention, the court again remarked, "[t]hat alternative contention appears not to have been pursued at trial." 732 F.2d at 377 n. 6. Nowhere in *SBC I* did this court hold that Southern was not entitled to amortize some portion of the premium paid to acquire American. This court's analysis was confined to Southern's *post hoc* attempts to allocate a portion of the premium to the loan portfolio. In denying the refund, this court merely held that Southern's loan portfolio argument was insufficient to carry its burden of proof and overcome the presumption of correctness attaching to the Commissioner's assessment. 732 F.2d at 378.[5]

Because the deposit base issue was not pursued at trial and not previously decided by this court, it could not be collaterally estopped by this court's opinion in *SBC I.*

### III

▪ Amortization of intangible capital assets qualifies for a depreciation allowance[6] if the taxpayer sustains the burden of proving a limited useful life, the duration of which can be ascertained with reasonable accuracy, and if the asset has an

---

**5.** The Tax Court stated that

once a claim relating to a particular tax year is litigated, the judgment thereon acts as collateral estoppel in litigation over another tax year with respect to matters actually litigated in the first proceeding. (citations omitted). Collateral estoppel applies to those matters in the later proceeding which were actually presented and determined in the first suit.

The Tax Court also noted that "[w]e recognized that the Court of Appeals apparently considered the deposit base theory abandoned." The Tax Court, however, disagreed with our conclusion on that point. While it is unclear what brought the Tax Court to that position, we must decide each case on the record that is before this court. There is nothing in this record persuading us to reach a conclusion contrary to *SBC I.*

**6.** The Treasury Regulations provide, in part:

If an intangible asset is known from experience or other factors to be of use in the business or in the production of income for only a limited period, the length of which can be estimated with reasonable accuracy, such an intangible asset may be the subject of a depreciation allowance. Examples are patents and copyrights. * * * No allowance will be permitted merely because, in the unsupported opinion of the taxpayer, the intangible asset has a limited useful life. No deduction for depreciation is allowable with respect to goodwill.

Treas.Reg. § 1.167(a)–3 (1987).

ascertainable value separate and distinct from goodwill or going concern value. *Houston Chronicle Publishing Co. v. United States,* 481 F.2d 1240 (5th Cir.1973), *cert. denied,* 414 U.S. 1129, 94 S.Ct. 867, 38 L.Ed.2d 754 (1974). The Tax Court in the present case did not resolve whether the deposit base was an asset with a value separate and distinct from goodwill or going concern value, nor did it determine whether it had a finite useful life. Rather, it denied Southern's claimed amortization deduction on the finding that Southern failed to meet its burden of proof. The Tax Court held that Southern failed to establish a useful life for the deposit base because the only evidence it offered for that purpose was hindsight, namely, account data from years after the tax years in question.

The Tax Court found that the present case was controlled by its decision in *Banc One Corp. v. Commissioner,* 84 T.C. 476 (1985), *aff'd,* 815 F.2d 75 (6th Cir.1987). In *Banc One* the Court considered whether a portion of the purchase price paid for two separate banks could be allocated to the deposit bases acquired in the transactions. The taxpayer presented evidence that amortization schedules prepared by a bank consulting firm established the useful lives of the deposits. In preparing the amortization schedules, the consultant chose sample accounts from years subsequent to the purchase transactions. The Tax Court found that the taxpayer's method of calculating the useful life of the deposit bases fell short of the required showing because the determination was based upon facts existing after the close of the years in issue and "the statistical accuracy [of the method] was conditional on the sample of accounts selected." 84 T.C. at 491.

We find *Banc One* persuasive. While Southern's expert testified that he considered the effect of using the 1984 data in determining the useful life of the deposit base as of the 1974 purchase date and, indeed, made adjustments for certain changes in banking patterns due to changes in competitive conditions between 1974 and 1984, we find this insufficient to establish the useful life of the asset.[7] The problem with this methodology is that it relies on facts and events subsequent to the purchase transaction and tax years in question.

The rule against the use of hindsight data is grounded in the Treasury Regulations, which state:

> The reasonableness of any claim for depreciation shall be determined upon the basis of conditions known to exist *at the end of the period for which the return is made.* It is the responsibility of the taxpayer to establish the reasonableness of the deduction for depreciation claimed.

Treas.Reg. § 1.167(b)–0(a) (1987) (emphasis added). The use of 1984 account closings to establish the useful life of the asset for prior years is not reasonable and is contrary to the requirements of the Treasury Regulations. The rationale behind prohibiting the use of hindsight evidence has been previously articulated by this court:

> Doubtless what is known and predictable at the time of the filing of the return may be considered in determining reasonable depreciation for the year involved, but taxation is made too uncertain and controversies too long extended if what is claimed or allowable as of the time the return is filed is made subject to revision and adjustment by the Commissioner or by the taxpayer in the light of events occurring several years later. What depreciation is allowable, therefore, is de-

7. Under Treas.Reg. § 1.167(a)–1(b) (1987), a taxpayer may also establish the useful life of an asset for depreciation purposes based upon the general experience in the industry if its own experience is inadequate. Southern claims that expert testimony and *Midlantic National Bank v. Commissioner,* 46 T.C.M. (CCH) 1464, 1475 (1983) ("If a set of deposit relationships is measured in initial balances, one-half of the acquired relationships can be expected to termi-

nate within seven to nine years"), establish a useful life of the deposit base based on general experience in the banking community. We question whether *Midlantic* provides any support for Southern on this point. As the Tax Court noted, Southern has not seriously based its argument on industry experience and the evidence in this case does not support such a claim.

terminable on the basis of facts known or reasonably predictable when the return is filed and may not be made dependent upon [events] realized in subsequent years.

*Johnson v. Commissioner,* 302 F.2d 86, 88 *cert. denied,* 371 U.S. 904, 83 S.Ct. 206, 9 L.Ed.2d 164 (1962).

We emphasize that our decision, like the decision of the Tax Court, is based on the 1984 data used by Southern as evidence for the useful life of the deposit base. When the methodology used by Southern was developed is immaterial; the methodology is inherently flawed because it relies on hindsight data. We also note that we do not decide the issue whether a portion of the purchase premium allocated to American's deposit base, if properly proved to have a finite useful life, would be amortizable.[8] Our decision rests on Southern's failure to produce adequate proof of the useful life of the deposit base. Therefore, the Commissioner's assessment for deficiencies will stand.

### IV

In conclusion, we hold that Southern's proof of the useful life of the deposit base was not based on facts existing and certain as of the close of the tax years in issue. Facts or data from subsequent years do not carry the taxpayer's burden. Therefore, the decision of the Tax Court as to this issue is

AFFIRMED.

---

**8.** Others attempting to establish such a deduction have met with a difficult fight as well. Once the issue of useful life is overcome, a taxpayer must prove, under *Houston Chronicle,* that the deposit base has a value separate and distinct from goodwill or going concern value. Given the very nature of the deposit relationship as an important point of contact with customers for selling a bank's other income producing services, we question the ultimate success of any attempt to separate the value of the deposit base from goodwill. *See Amsouth Bancorp. v. United States,* 681 F.Supp. 698 (N.D.Ala.1988) (taxpayer failed to meet burden of proof that deposit base had a value separate and distinct from goodwill). While some taxpayers find it difficult to accept, there are some things that may not be subject to amortization or depreciation.